[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR IMMEDIATE HEARING SEEKING PERMISSION TO RELOCATE
Review of the File
The original writ, summons and complaint concerning the matter in caption, first came to the court pursuant to a complaint that was dated March 25, 1998 and with a return date of April 21, 1989. This complaint was brought by the plaintiff petitioner, Daniel F. Thomas, against the defendant, Ataya K. Thomas. It was brought on a pro se status basis by the plaintiff, Daniel Thomas. In the complaint, which set forth the wife's birth name, the date and place of marriage; to wit, November 2, 1991 in Wetherford, Texas, the complaint represented the requisite residency requirement, indicated that the marriage had irretrievably broken down, listed two minor children; to wit, Kayla Danielle Thomas, born February 15, 1992 and Sydney Ataya Thomas, born May 3, 1996.
The sole request in the prayer for relief in that pro se complaint was CT Page 4692 for a dissolution of the marriage.
In due course, on April 22, 1998, the defendant Ataya Thomas, filed an appearance with the court.
Financial affidavits were filed by the parties and in due to course; to wit, on August 6, 1998, the court, Quinn, J., granted a dissolution of the marital union, awarded sole custody of the two minor children to the defendant mother, granted reasonable rights of visitation to the plaintiff father, an order of child support in the amount of $600.00 per month was entered along with a wage withholding order and obligation as to the plaintiff to provide health insurance.
The next item in a review of the file was an appearance filed by the defendant, Ataya Thomas, on June 30, 1999 when the defendant, Ataya Thomas, filed a motion for contempt.
The file contains a motion to reopen judgment and modify custody and child support dated February 3, 2000 and filed February 10, 2000. The motion was filed on behalf of the plaintiff
Orders were entered incident thereto on March 20, 2000 by the court, Kenefick, J.
On March 23, 2000 the defendant, Ataya Thomas, filed a motion for contempt incident to her endeavoring to enforce the provision according medical insurance for both of the children in accordance with the decree indicating that the plaintiff had failed to provide that coverage since being discharged from the U.S. Navy on December 19, 1999.
On March 20, 2000, the file contains an agreement of the parties to this effect: the judgment may be reopened and modified as follows. (1) Plaintiff will pay $200.00 bi-weekly as child support. Further notation that proof of providing of medical insurance for the children has been attended to and a provision whereby the plaintiff would provide quarterly income statements to the defendant.
On June 28, 2000, another motion for contempt was filed by the defendant as concerns various and sundry debts and obligations and the defendant's request for reimbursement of the same.
On August 21, 2000, an agreement was executed between the parties whereby the plaintiff agreed to pay off certain stated debts and obligations.
On April 2, 2001, the court, McLachlan, J., accepted a stipulation CT Page 4693 between the parties dated April 2, 2001.
On March 12, 2001, new counsel appeared for the plaintiff
On March 19, 2001, the defendant filed another motion for contempt as concerns the defendant representing that "the plaintiff has moved out of state and has not given child support and also does not have health insurance coverage for our children as he is obliged per the original divorce decree."
On March 29, 2001, counsel appeared for the defendant.
On June 11, 2001, the plaintiff filed a pro se appearance with the court and financial affidavits incident thereto, as well as a schedule of debts.
On April 18, 2001, the file contains an order by McLachlan, J., as concerns claiming the minor children for income tax purposes as exemptions. See modification of the original decree under date of April 12, 2001 and further modification of the decree under date of September 4, 2001 by the court, Devine, J.
On September 4, 2001, a certain stipulation post-judgment was filed, which would indicate that the plaintiff contemplated or has proceeded with or been adjudicated bankrupt.
On June 22, 2001, a motion for modification was filed by the plaintiff indicating "the defendant is moving out of state, change job status, change of child care." This motion was continued on various dates including a continuance by the court, Kenefick, J., wherein the Court appointed Attorney Paige Quilliam as attorney for the minor children. An order by the court, McLachlan, J., under date of July 23, 2001 directing that the defendant mother should return to Connecticut with the minor children and that they should be made available to the attorney appointed for them, Attorney Quilliam. This order reduced support to $150.00 per week without prejudice. The matter was continued.
On July 23, 2001, a motion to refer to Family Relations Services Unit was filed by counsel for the plaintiff and that motion was granted by the court, McLachlan, J., on July 23, 2001.
Under date of July 23, 2001, new counsel appeared for the plaintiff.
On August 13, 2001, the defendant filed a motion for contempt post-judgment as concerns the obligation of the plaintiff to pay certain debts and obligations. This motion was granted in accordance with a CT Page 4694 stipulation dated September 4, 2001 by the court, Devine, J.
On August 13, 2001, another motion for contempt post judgment was filed with regard to the plaintiff's obligation to provide insurance for the minor children. This motion was granted by the court on September 4, 2001 by the court, Devine, J.
The defendant filed another motion for contempt post judgment on August 13, 2001. This had to do with support payments. This motion was granted by the court by stipulation dated September 4, 2001 by the court, Devine, J.
The plaintiff and the defendant with their respective attorneys and with the presence of the attorney earlier appointed for the minor children appeared before the court with their witnesses and the matter was heard to a conclusion. The parties, their witnesses and counsel were before the court on March 28, 2002 and April 2, 2002.
The court makes the following findings of fact:
The court addresses the testimony adduced at the time of the proceeding in the order in which the witnesses were presented to the court.
From the testimony of the witness, Sharon Kestin, the court finds that Ms. Kestin is a family relations counselor attached to the Superior Court and has acted in this capacity for the past 14 years. She has participated in short calendar matters, mediation matters, domestic violence proceedings, protective orders and matters of like nature. The witness Kestin has a bachelor's degree and a master's degree in her field of expertise in counseling, has prepared between 200 and 300 reports over the years, has appeared in court on many occasions, has conducted or participated in relocation hearings and prepared reports incident thereto; as many as 30 and 40 reports in this type of category.
An investigation request was referred to this witness on August 13, 2001, as concerns the defendant's request for permission to relocate to the State of Georgia with the children, Georgia being the assigned naval military facility of the defendant's fiancé. Incident to the testimony of Ms. Kestin, there was submitted to the court Defendant's Exhibit 1 entitled "Judicial Branch, Superior Court, Family Division, Custody Evaluation Report." The referral date was August 13, 2001. The completion date was November 6, 2001.
The report was requested by the court, McLachlan, J. The report is detailed and lengthy and contains certain conclusions and recommendations, which the court will touch on in due course. CT Page 4695
Defendant's Exhibit 1 sets out with detail the various and sundry contacts that the preparer of the report resorted to in order to formulate and structure the report. The Family Services Unit statement reflects numerous client contact with both the plaintiff and the defendant and the children. In addition thereto, in the category of "Collateral Contacts," the document refers to contacts by the Family Relations counselor with counsel, with the children, with the fiancé of the defendant, the children's dentist, a State Police record check, the present new wife of the plaintiff, the defendant's therapist, psychiatrist, the references provided by the plaintiff, the mother's references, various contacts with teachers, social workers, the Stanton Elementary School, the Buckingham School, the teachers Jacobs, Tangeri and Garber.
Incident to her investigation, the witness Kestin testified as to her contacts with the fiancé of the defendant and indicated that he appeared to be a good, prospective stepparent.
The witness Kestin testified that it was in the children's best interest that they be allowed to go to Georgia with their parent mother and that a negative impact would occur insofar as the children are concerned if they were required to stay and remain in Connecticut.
The plaintiff, after leaving military service and being in Connecticut at that time, had a post with the Corrections Department of the State of Connecticut. At some point in time thereafter, he resigned that post and on his own motion removed himself to Texas looking toward the expectation and possible employment with his brother for a profitable employment in that location. Apparently that did not work out. As noted, the plaintiff has remarried since the time of the dissolution.
The two children involved in this proceeding are Kayla who is age 10 and Sydney is age 5.
In conducting her inquiry, the witness Kestin determined from the defendant's fiancé that Mr. Gallentine would supposedly be in Georgia at King's Bay, assigned there for the next three years. It was represented that Gallentine is a career Navy man in the submarine service and admittedly is away on various occasions for extended periods of time mindful of his naval duties.
The witness Kestin's investigation disclosed that Gallentine had previously been married; now divorced; no children issue of that relationship. CT Page 4696
According to the report, neither the plaintiff or the defendant are originally from Connecticut and were only here incident to Connecticut being the last duty station of the plaintiff in the United States Navy. As noted, the plaintiff terminated his naval service in December of 1999 and was honorably discharged.
The witness Kestin in her contacts with the children described them as wonderful and beautiful and that they do well in school.
Incident to the decree originally entered by the court, Quinn, J., the defendant had sole custody of the two children with visitation rights as spelled out in the decree.
The witness Kestin's report indicated and her testimony was to the effect that the plaintiff's present wife has two children, but they do not reside with the plaintiff and his present wife, but allegedly reside in Ohio with their father.
The defendant's fiance presently is at sea with the naval service. According to the testimony of the witness Kestin, there is a good relationship between the two girls and Gallentine.
It appears that there were prior matters scheduled as concerns this problem and that on two prior occasions, presumably because of the distance and finances, the defendant was not able to appear and the matter delayed to the present point.
The plaintiff and the defendant appear to be both high school graduates. The nature and extent of the plaintiff's training or further education in the Navy is a matter of conjecture.
The testimony of the defendant, whose maiden name of Arnold was restored to her at an earlier point, was to the effect that the plaintiff and the defendant had originally been married in the State of Texas in 1991 and subsequently had resided in Florida and up until the time of the dissolution of their marital union, Connecticut.
The defendant was age 16 when she entered into that marital union and parental consent was required.
The defendant's testimony was to the effect that in 1995 the parties had separated for a time and during that separation period the plaintiff saw or had some contact with his present spouse.
The defendant has been the primary caretaker of the two children, Kayla and Sydney, since the divorce and the plaintiff only gave the defendant CT Page 4697 short notice with regard to his intentions to remove himself to Texas incident to his hope and expectation for better employment with his brother.
In May of 2001, the plaintiff indicated to the defendant his intention to return to Connecticut. According to the defendant, incident to one conversation between the plaintiff and the defendant, the defendant was represented to have indicated that he had no objection to her relocation to Georgia.
Incident to matters of visitation, apparently to avoid conflicts, the children were picked up or dropped off at a McDonald's restaurant.
After the dissolution of the marriage of the plaintiff and the defendant, the defendant undertook a friendship with her present fiancé, Mr. Gallentine, and the parties have resided together since that time. The defendant contemplates being married to Gallentine on September 28, 2002. The ceremony to be performed by the Rev. Kenneth Jones.
Mr. Gallentine is a yeoman, first class petty officer, E-6, in the United States Navy. His present orders, reflected in Defendant's Exhibit 2, indicate that he is being assigned to King's Bay, Georgia for naval service there. Gallentine is presently at sea on a submarine, the USS Maine.
The defendant's fiancé apparently has been close to the children. He has attended parent-teacher meetings involving the children and school guidance matters.
After coming to Connecticut with her then husband, the defendant participated in a business entity known as Motherhood Maternity where she earned $7.50 an hour for a 35-40 week. Subsequently, the defendant was employed for a time with U.S. Food Services. The defendant at the present time is not employed and has held off actively seeking employment here in anticipation of being allowed to remove herself and the children to Georgia.
The defendant presently resides in a two-bedroom apartment with a female friend and is not being charged any rent. The defendant's testimony was to the effect that Mr. Gallentine has made and placed a deposit on an apartment in Georgia in the Harbor Pines area in the town of St. Mary's, Georgia. The apartment is allegedly on hold pending the defendant's possible relocation to that state. Apparently no formal lease has yet been signed. CT Page 4698
The defendant has made inquiry with regard to schools in Crooked River, Georgia. She has given the plaintiff the name and data as to schools in Georgia on the premise that the children might be attending there.
The defendant has given the plaintiff data with regard to doctors and dentists and matters of allied nature in the Harbor Pines, Georgia location.
The defendant and Gallentine presently have a joint account. Gallentine voluntarily helps the plaintiff financially and the defendant's testimony was to the effect that he has on occasion purchased clothes for the children. The present in-place medical coverage for the two children, Kayla and Sydney, is incident to medical coverage that is provided by the plaintiff's present wife.
The contemplated monthly rent in naval housing in Georgia for the defendant and Gallentine, if the defendant should be allowed to go there, would be $575.00 a month. This presumably after the parties were joined in marriage.
The defendant and Gallentine apparently intend a church wedding in the Immaculate Conception Church in Pennsylvania which is apparently the home of her fiancé.
The court observed the defendant to be reserved in her conduct, quiet and stable. She appeared to be fairly well spoken. The defendant indicated a willingness to grant to the plaintiff as much as six weeks in the summer and other liberal visitation if the relocation should be permitted.
The defendant testified that she is willing to put in place a personal telephone or communication line with an answering service which will help and facilitate telephone contacts between the plaintiff and the children.
From the testimony, it appeared that at the time that the dissolution of the parties was initially heard by the court, Quinn, J., that the plaintiff was at sea with the U.S. Navy.
The parties apparently, according to the testimony, had discussed custody between themselves prior to the divorce being granted.
The defendant indicated that the children, Kayla and Sydney, are doing exceptionally well in school here in Connecticut. CT Page 4699
On occasion, when required, the friend of the defendant, who is providing housing at no cost, has looked after the children if necessary.
The defendant's name appears on the account which Gallentine has structured and on which the defendant can draw.
The defendant's testimony as concerns her two prior failures to attend a hearing was to the effect that she had called her counsel's office and made counsel aware of her circumstances when she was in Texas visiting her parents.
On the occasion when the defendant was in Texas, she had stayed there with her parent mother and father.
Methods of travel as between Connecticut and Georgia on the premise that the defendant and the children might be allowed to relocate there would presumably be either by bus, rail, plane or private automobile transportation.
The defendant testified that she intends to seek employment in Georgia if permitted to go there; employment in the field of customer service, secretarial work or allied matters.
There was testimony to the effect that the child Kayla is involved in basketball, physical activities; that both of the children appear to be happy and that they are a pleasure to be around in the presence of adults; that the child Sydney has some skills in drawing; both of the children, according to the testimony, like baseball.
The testimony also was to the effect that in the past, during the time of the marital union between the plaintiff and the defendant, that there were problems of communication, each to the other.
If allowed to attend in Georgia, and post-marriage, the defendant and the children, through the good offices of her fiancé, would be allegedly allowed to live in the military complex area; there, which is considered to be safe, beaches and parks are available. The cost of living allegedly is less than what would be the case in Connecticut.
Other testimony indicated that the monthly rental charge at Harbor Pines might be as little as $560.00 a month.
The defendant testified that she is in good health; adverted again to the joint account with her fiance, indicated that there was a balance in that account now of between $7,000.00 and $8,000.00, reaffirmed that she was staying with a female friend and not required to pay rent at this CT Page 4700 time.
The plaintiff testified that he is currently employed by Kelly Services for certain employment work located in Hopkinton, Rhode Island. His hours are from 7:30 in the morning to 4:00 p.m. He engages in an 80-mile per day commute one way. His compensation is at $14.00 an hour. The plaintiff is engaged in working on a natural gas pipeline. He works on compressors incident to that position.
While in the naval service, he had training in nuclear energy.
Initially after leaving the service, the plaintiff had a variety of tasks including working in a grocery store, subsequently working for Corrections, as earlier adverted to.
When the plaintiff decided to leave Connecticut to go to Texas incident to the possibility of employment with his brother, he gave the State one week's notice prior to departing.
Apparently the plaintiff has attempted to rescind his resignation from Corrections. Effective March 2001 the rescission has allegedly been denied.
At one point in time after leaving the service, the plaintiff was employed by Waterford Country Schools where he did grounds work at $9.75 an hour. Incident to that employment, there were no health insurance benefits available for the children.
The plaintiff recently filed a petition in bankruptcy and presumably was discharged from his outstanding debts and liabilities.
As earlier noted, the plaintiff's present spouse does not have custody of her children who reside in Ohio.
The plaintiff, with his present wife, resides in the home of her parents.
The plaintiff's testimony was to the effect that he left the Corrections position because he did not enjoy it. The plaintiff indicated that he had many kinfolk in Texas. The plaintiff's stay in Texas, incident to the possible job employment then offered, was for a period of three months.
The child Kayla was described by the plaintiff as a sensitive child and thoughtful. Kayla's ability artistically was noted.
The plaintiff is familiar with the King's Bay, Georgia naval facility CT Page 4701 having once been there in 1997.
The plaintiff indicated that in the academic arena that the child Sydney was doing well; that the child Kayla needed some extra help and improvement in her academics and allegedly was inclined to talk too much in class. Basically, however, both children's grades are good.
The plaintiff's present employer through Kelly Services is with the Tennessee Gas Pipeline Company.
In the event that the defendant and the children should be allowed to go to Georgia, the plaintiff seeks at least six weeks with the children during the summer.
Returning to Defendant's Exhibit 1 prepared by the witness Kestin, the court has very carefully read the exhibit and the detailed report. The Kestin report characterizes the defendant as a good mother and that the relationship between the defendant and Mr. Gallentine has been one where a pretty good track record has been established.
From the exhibit, the defendant's fiancé, Mr. Gallentine, is 33 years old, divorced with no children and a yeoman in the Navy, as already noted. Kestin's report indicates that he appears to be genuine and committed in his relationship with the defendant and her children.
The plaintiff married one Lisa Briggs in September of 1999; that lady is divorced with two children who live in Ohio with their father as earlier noted. The plaintiff's present wife is 30 years, an only child, and employed as a pharmacist's assistant.
This exhibit indicates that the plaintiff initially offered no objection or resistance to the prospect of the defendant and the children moving to Georgia until the defendant and the children were in fact packed to go and on their way when the defendant was served with the current motion.
The report contains an observation from information from the school situation of the two children attending a facility known as the Gingerbread House where the children were described as being "no problem," "good children," "sweethearts."
The witness Kestin, incident to the various and sundry sources that she sought out, spoke with the children's pediatrician; nothing remarkable as to their health was uncovered except for significant dental decay. This apparently is being addressed. CT Page 4702
On the basis of the content of the Kestin report, it would appear that there is a strong bond or relationship between the child Kayla and the plaintiff, her parent father.
The witness Kestin made home visits incident to her investigation and in the report again characterized the children as beautiful girls with outgoing personalities and observed that the children enjoy a close relationship with both parents.
References sought incident to the Kestin investigation spoke favorably on behalf of each of the parents.
Under the heading "Conclusions and Recommendations" in the Kestin report, the preparer notes that "while both parents currently reside in Connecticut, there is no assurance that father will not move again, either to his home state of Texas or elsewhere."
The witness Kestin then goes on to make recommendations to the court to the following effect: (1) the parents share joint custody, primary residence with the mother, (2) the children be allowed to move from Connecticut with their mother, (3) father have visitation in the children's home state with 48 hours notice, (4) father have visitation in his home state during the children's Christmas break in even-numbered years and during their Spring break in odd-numbered years, (5) father have visitation in his home state for six weeks each summer at times to be arranged by mutual agreement of the parents, (6) father have reasonable rights of telephone access to the children, and (7) mother provide father with all relevant school, medical and activity information in a timely fashion.
Defendant's Exhibit 2 is merely a verification as to the status of the assignment for the fiancé of the defendant, one James M. Gallentine, and verifying his military status and attachment to King's Bay, Georgia as testified to during the proceedings.
Defendant's Exhibit 3 is a statement under the heading of "State of Connecticut, Department of Corrections" as concerns the plaintiff indicating that the plaintiff would be entitled to withdraw his resignation with Corrections and return to good standing in accordance with their regulations and rules.
From the financial affidavits filed with the court on March 28, 2002, the court finds as to the plaintiff Daniel Thomas that he is employed by Kelly Services. His gross weekly wage is $553.00. Deductions for federal and state taxes, FICA, amount to $123.11, for a net weekly wage of $429.89. His weekly expenses total $448.11 and these expenses include the CT Page 4703 present order of child support in the amount of $100.00 a week. As to debts and obligations, the financial affidavit reflects the following words, "bankruptcy petition pending, final hearing this month."
On his financial affidavit, there is no real estate disclosed, no automobile shown or disclosed, a total of $350.00 in the Citizen's Bank checking and savings account. No other assets of any description appear within the confines of the financial affidavit report.
From the financial affidavit of the defendant, the defendant is presently unemployed. Her only source of income is indicated at $100.00 a week; this being the order of child support. Her total weekly expenses amount to $238.32, but the court notes that in her financial affidavit there are no figures at all in the category of rent, fuel, electricity, gas, water, telephone, cable TV and matters of like nature. The defendant reflects a debt of $3,000.00 on a Discover card. No real estate shown. The defendant shows a 1998 Kia automobile valued at $8,000.00, apparently free and clear, a computer and household furnishings valued at $1,800.00, $150.00 in the bank, a 401K with U.S. Food Services, a prior employer, $300.00. Total cash value of all the defendant's assets, $10,250.00 of which of course the automobile is the principal asset.
 The Law
The court has carefully considered the opinion of the court in Irelandvs. Ireland, 246 Conn. 413 (1998) and the criteria and guidelines enunciated in that proceeding, and the criteria which the court must consider with regard to a request by a parent to relocate, including the obligation on the custodial parent seeking to relocate and the obligation resting on the custodial parent to prove by a preponderance of the evidence that the proposed relocation is motivated by a legitimate purpose, and that the new location bears a reasonable relation to that purpose. Once the custodial parent has made such a prima facie showing, the burden then shifts to the noncustodial parent to prove by a preponderance of the evidence that the relocation would not be in the best interest of the children.
In arriving at that decision, and in determining the children's best interest, the court should consider the factors set forth in part 2 ofIreland giving each relevant factor the appropriate weight under the circumstances and being mindful that the list is not exclusive and that the court in making its determination as to the best interest of the children should not consider the report submitted by the attorney for the children.
From Ireland the court notes, "these factors as set forth by the CT Page 4704 Appellate Court are (1) advantages of the move in terms of its likely capacity to improve the genuine quality of life for the custodial parent and child or children, (2) motivation or good faith of the custodial parent in desiring relocation; specifically, if interference in noncustodial parents' visitation or relationship is a factor in the move, (3) likelihood of custodial parent to comply with visitation orders necessitated by relocation; (4) good faith or motivation of noncustodial parent in resisting relocation, and (5) whether if relocation is allowed there is a realistic opportunity for a visitation schedule that will provide an adequate basis for preserving and fostering the parental relationship with the noncustodial parent; noting D'Onofrio v.D'Onofrio.
Reference is made to the case of Ireland v. Ireland, 246 Conn. 413
(1998) which is the leading case authority with regard to relocation matters in this state.
The Ireland case addressed the following issues: (1) did the trial court consider the correct criteria for determining the best interest of the child when the parent who was awarded primary physical custody of the child wishes to relocate, (2) was the trial court correct in placing the burden of proof on the custodial parent, and (3) was the trial court correct in prohibiting the custodial parent from calling the attorney for the minor child as a witness to examine him with respect to his written report filed with the court recommending that the child's best interest should be served if the child remains in Connecticut.
The Ireland court indicated, "we conclude that a burden allocation scheme incorporating shifting burdens as articulated below is appropriate in relocation cases." In subsection A of the opinion, "it is well settled in this state that, in deciding custody or visitation issues, a court must always be guided by what is in the best interests of the child." SeeYontef v. Yontef, 185 Conn. 275; Knock v. Knock, 224 Conn. 776; andSchult v. Schult, 241 Conn. 767. It is the ultimate welfare of the child or children which must control the decision of the court.
Again, from Ireland, clearly there is a very close relationship between the protection of the interest of children in custody and visitation matters and the interest of child in relocation cases. The only difference relevant to this discussion is that the former are expressly protected by statute whereas the latter are protected by interpretation of the policy behind the statutes.
Again from Ireland, subsection B, "we recognize the difficult issues that relocation cases present. The interests of the custodial parent who wishes to begin a new life in a new location are in conflict with those CT Page 4705 of the noncustodial parent who may have a strong desire to maintain regular contact with the child."
Again from subsection B, "the realities of divorce make clear that the dissolution of a marriage between parents of a minor child inevitably alters the character of the parental relationships of both the custodial parent and the noncustodial parent. It may not be realistic to try to preserve completely the quality and nature of the relationship that the noncustodial parent enjoyed with the child, especially if such preservation is maintained at the cost of the custodial parent's ability to start a new, potentially improved life for herself or himself and the child."
Again from Ireland, "a parent who relinquishes a significant life-enhancing opportunity in order to maintain custody of a child may become distraught and depressed . . . The child may well experience diminished parenting as a result of the parent's discouragement and suffering . . . The child may suffer great anguish and blame himself or herself for having stood in the way of the parent." The foregoing from a work by J. Wallerstein, et al, entitled, "To Move or Not to Move."
Again from Ireland, "the move may offer benefits, such as the promise of economic, emotional, financial or educational enhancement of the child's life."
Again from Ireland, section B1, a reference to "a vindictive desire to interfere in the relationship between the noncustodial parent and the child," and again from the American Law Institute in Its Principals of the Law of Family Dissolution, "a parent who has been exercising a significant majority of the custodial responsibility for the child should be allowed to relocate with the child so long as that parent shows that the relocation is in good faith for a legitimate purpose and to a location that is reasonable in light of the purpose."
Again from Ireland, "our society is an increasingly mobile one. Largely because of the instability and unpredictability of the employment market . . . the high incidence of remarriage, and the high incidence of second divorces," therefore, to serve the best interest of a child in a single-parent family unit, the custodial parent should be permitted to pursue within reasonable limits opportunities that could lead to a better life for the parent as well as the child.
Again from Ireland citing D'Onofrio v. D'Onofrio, "a noncustodial parent is perfectly free to remove himself from a jurisdiction despite the continued residency there of his children in order to seek opportunities for a better or a different lifestyle for himself." CT Page 4706
Again from Ireland, "we likewise believe that a custodial parent with potentially bright prospects on a distant horizon should not be tethered indefinitely to the noncustodial parent's choice of residence, as long as the proposed relocation is in the best interests of the child."
Again from Ireland, "in fact we believe that an attempt to determine what is best for the child without consideration of what is best for the family unit with whom the child spends the most significant amount of his or her time would be an incomplete inquiry. Requiring the custodial parent to forego potential benefits of a relocation such as educational, employment or marriage opportunities would deny the child correlative benefits of such opportunities; for example, increased financial or emotional stability of the family unit."
 Discussion
The issue presented to the court is the propriety of considering and perhaps granting the defendant mother's request for permission to relocate to the State of Georgia with the two children, Kayla and Sydney, ages 10 and 5, and whether that contemplated move is in the best interest of the children along with a fair and evenhanded assessment as to both the plaintiff and the defendant.
Neither party have any long-term prior history or association with the State of Connecticut. The defendant and the children are only here because it was the last duty station of the plaintiff while he was in the service.
The defendant's financial situation at present is relatively precarious. Housing has been provided to her through a female friend, rent free.
The defendant is unemployed. She is not highly skilled. She appears, however, on the basis of the court's observations, to be a reserved individual who appears to demonstrate an abiding love and affection for the children and being desirous of what is in their best interest. Her financial ship is only kept afloat by virtue of the kindness of the female friend with whom she is residing, the generosity or largesse of her intended spouse or fiancé Gallentine by setting up the joint account and on occasion by her parents who are in Texas.
The court was not made aware of any near-term prospects that would be available to the defendant for profitable, long-term employment here and, by and large, her skills are relatively limited. CT Page 4707
It is a testimonial to both of the parents that the children have been as well adjusted as they are and have merited the adjectives used by those who have seen the children and talked with them, either the witness Kestin or observations from their teachers and other professionals.
The defendant is desirous of getting on with her life which she is entitled to do. The plaintiff has gotten on with his; he has mated his present spouse and resides with her in the home of her parents. Manifestly, it would be unreasonable to assume if there was a change in custody that the children would have an opportunity to reside with the plaintiff father in that setting.
Mindful of the problems earlier related in this memorandum, financial and otherwise, and the modest amount that the plaintiff has been paying by way of support, there was no indication or representation made to the court during these proceedings that the plaintiff is prepared to materially and substantially provide greater financial wherewithal which would allow for financial stability and security here in Connecticut should the court require the defendant and the children to stay here.
By and large, the investigation done by the witness Kestin and the testimony would suggest that the motivation of the defendant incident to the requested relocation is genuine. The defendant's appearance and testimony appeared to be sincere, direct and candid. The plaintiff had no compunction about returning to Texas incident to trying to secure advanced or increased compensation in employment, which of course he is entitled to do, and to his credit perhaps, but he sought no blessing from the defendant in that respect.
The court is inclined to the view that the defendant has no wish to materially impair or impede a relationship between the children and the plaintiff. The court is inclined to the view, mindful of the track record established in the file, that the defendant is willing and would continue to be willing to comply with whatever visitation orders were imposed if a relocation were to occur.
The court does not necessarily question the good faith or motivation of the plaintiff with regard to resisting the relocation; however, the issue presented to the court is somewhat broader than that. The plaintiffs wish to have the defendant and the children remain here certainly poses substantial financial and other problems for the defendant. She has no family here. Manifestly, financial considerations would come into play with regard to transportation costs and the distance that would be involved between Connecticut and Georgia. However, the court is inclined to the view that they are not insurmountable. CT Page 4708
Further, on the basis of the defendant's attitude, proposed orders and so forth as submitted by counsel, would not appear to thwart an adequate basis for preserving and fostering a parental relationship between the plaintiff and the children.
The defendant's reasons for seeking permission to travel to Georgia appears to be an honest one; there is nothing to indicate that the defendant has in any way impeded or lessened the quality of the relationship between the children and the plaintiff. It would appear that the defendant's economic stability as well as her emotional and educational situation would be considerably enhanced by allowing the move to Georgia and the court believes that there would be no irreparable harm done as concerns the rights of the plaintiff should the court allow the move to take place.
Noting from the decision in Ireland, "requiring the custodial parent to forego potential benefits of a relocation, such as educational, employment or marriage opportunities, would deny the child the correlative benefits of such opportunities; for example, increased financial or emotional stability of the family unit."
The presence in the picture of the defendant's fiancé would appear to be, as best the court can devine, from the testimony and the report of the witness Kestin, a positive therapeutic factor. There is nothing that was presented to the court to suggest that the defendant was attempting in any way to intentionally frustrate the plaintiff's access to the children. What prospects exist in Connecticut if the defendant is required to remain here under the present economic situation? The defendant's situation would be, in the court's opinion, a perilous one. The engagement with the fiancé might founder; hopefully not, but it certainly could occur. The fiancé might withdraw the defendant's access to the joint account and the defendant's parents manifestly are no longer required to provide financial support for the defendant and the children.
Again with reference to the Ireland decision, "there are undoubtedly also many cases where less frequent but more extended visits over summers and school vacations would be equally conducive or perhaps even more conducive to the maintenance of a close parent-child relationship since such extended visits give the parties the opportunity to act in a normalized domestic setting.
At the conclusion of the proceedings before the court on April 2, 2002, mindful of the issues presented to the court, the court required counsel for the plaintiff, counsel for the defendant and counsel for the minor children to file briefs. Each counsel promptly complied within the CT Page 4709 time frame designated by the court. The court thereafter carefully considered the briefs filed by the respective counsel and in order to leave no stone unturned requested counsel to reappear before the court on April 12, 2002 at which time the court solicited further comment from counsel as to their positions contained within the confines of their briefs or memorandums of law.
The court was particularly concerned with regard to the conclusion portion of the plaintiff's post trial memorandum of law dated April 9, 2002. The court believes that there are sufficient facts established by either testimony adduced at trial or predicated on the exhibits, which relied upon by the court provide a sufficient basis so that the court is not sending the children into a vacuum about which nothing is known. The court has reflected at considerable length with regard to the issue presented. The court has reflected upon the stability and financial assistance provided by the defendant's fiancé Gallentine over the last four years. The court believes that this is indicative of a reasonably good track record on his part. Admittedly there may be uncertainty in certain hoped for matters but the court feels that the defendant should not be denied her opportunity for some happiness and financial stability for both herself and the children.
Addressing the issues raised in Ireland, the court finds on the basis of the testimony adduced and the exhibits presented that the advantages of the contemplative move by the defendant and the children is likely to improve the general quality of life for the custodial parent and the children.
The court finds that the motivation or good faith of the custodial parent, the defendant, in desiring relocation is genuine and there is absolutely no indication of any spite or vengeance or animosity that motivates the defendant.
The court finds and believes that the defendant as the custodial parent will comply with visitation orders necessitated by the relocation.
The court understands the plaintiff's wishes and concerns with regard to maintaining an ongoing, proper and in-depth relationship with the children.
The court being mindful of problems that may arise with regard to the distance between Connecticut and Georgia nevertheless on the basis of the suggestions made to the court and the orders which the court intends to enter that an adequate basis will be established and preserved for fostering an appropriate relationship between the plaintiff and the children. CT Page 4710
The court believes and finds that the defendant parent mother has met her burden with regard to the propriety and the appropriateness of her wish and inclination to be able to move to King's Bay, Georgia with the children for the purposes outlined in this memorandum.
The court enters the following orders.
The two minor children, Kayla and Sydney, shall be allowed in the company of their parent mother to move and relocate to King's Bay, Georgia forthwith.
The plaintiff and the defendant shall have joint legal custody of the minor children with the primary physical residence of the children being with the defendant mother.
Each parent shall be entitled to complete detailed information from any teacher or school and shall be entitled to be furnished with copies of all reports and records with respect to the children.
The parties shall cooperate with each other to ensure that all information pertaining to the children's school activities, educational progress, physical and emotional health, sports activities and all other extracurricular activities are provided to both parents.
In the event that the parties are unable to make arrangements to receive separate notification as provided above from facilities such as schools, the defendant mother shall provide all such information or documentation as comes to her attention or is provided to her to the plaintiff in a timely fashion.
Each party shall have telephone access to the children at all reasonable times when the children are with either party.
The defendant shall make arrangements for the children to have their own separate telephone line for purposes of communicating with the plaintiff.
The plaintiff shall have the right of visitation in the children's home state with 48 hours advance notice.
The plaintiff shall have visitation with the children in his home state during the children's Christmas break in even-numbered years and during the children's Spring break in odd-numbered years.
The plaintiff shall have visitation with the children in his home state CT Page 4711 for six weeks each summer at times to be arranged by mutual agreement of the parties.
By agreement, of course, the parties may adopt and make such modifications of the visitation schedule as is acceptable and agreeable to both.
Austin, J.